772 December 29, 2023 No. 40

IN THE SUPREME COURT OF THE
STATE OF OREGON

Christine MOODY,
individually, and in her capacity as
the Personal Representative of the Estate of
Steven "Troy" Moody, Deceased,
*Respondent on Review,*

*v.*

OREGON COMMUNITY CREDIT UNION,
aka OCCU, an Oregon entity,
association, union, or corporation et al.,
*Defendants,*

*and*

FEDERAL INSURANCE COMPANY,
an Indiana corporation,
*Petitioner on Review.*

(CC 19CV26557) (CA A172844) (SC S069409)

On review from the Court of Appeals.*

Argued and submitted November 17, 2022.

Daniel R. Bentson, Bullivant Houser Bailey PC, Seattle, Washington, argued the cause for petitioner on review. R. Daniel Lindahl, Bullivant Houser Bailey PC, Portland, filed the brief on the merits for petitioner on review, and Daniel R. Bentson filed the reply brief. Also on the briefs was Stuart D. Jones.

Travis Eiva, Eiva Law, Eugene, argued the cause and filed the brief for respondent on review.

Ralph C. Spooner, Spooner & Much, PC, Salem, filed the brief for *amici curiae* American Property Casualty Insurance Association and National Association of Mutual Insurance Companies. Also on the brief was David E. Smith.

_____

* Appeal from Lane County Circuit Court, Bradley A. Cascagnette, Judge. 317 Or App 233, 505 P3d 1047 (2022).

Sage R. Vanden Heuvel, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, California, filed the brief for *amici curiae* Chamber of Commerce of the United States of America and Oregon Business & Industry. Also on the brief was Paloma Sparks, Oregon Business & Industry, Salem.

James S. Coon, Thomas, Coon, Newton & Frost, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association. Also on the brief were John A. McHugh, MCH LAW LLC, Wilsonville, and Kristen William, Williams Weyand Law LLC, Salem.

Iván Resendiz Gutierrez, Miller Nash LLP, Portland, filed the brief for *amicus curiae* United Policyholders. Also on the brief were Seth Row and Jodi S. Green, Long Beach, California.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, and Bushong, Justices, and Balmer and Walters, Senior Judges, Justices pro tempore.**

WALTERS, S.J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Garrett, J., dissented and filed an opinion, in which Duncan, J., and Balmer, S.J., joined.

---

** Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case. James and Masih, JJ., did not participate in the consideration or decision of this case.

## WALTERS, S.J.

Plaintiff, whose husband was accidentally shot and killed during a camping trip, brought this action against defendant, a first-party life insurer, claiming, among other things, that defendant had negligently failed to investigate and pay her claim for policy benefits, causing her to have fewer financial resources to navigate the loss of a bread-winning spouse and, consequently, to suffer economic harm and emotional distress. The trial court granted defendant's motions to dismiss plaintiff's negligence claim and to strike her claim for emotional distress damages. The Court of Appeals reversed. *Moody v. Oregon Community Credit Union*, 317 Or App 233, 248, 505 P3d 1047 (2022). Although our reasoning differs, we concur in the decision of the Court of Appeals, and we hold that plaintiff has pleaded facts sufficient to give rise to a legally cognizable common-law negligence claim for emotional distress damages.

## I.   FACTS AND PROCEDURAL HISTORY

Because the trial court granted defendant's motion to dismiss, we take the following facts from plaintiff's complaint. *Paul v. Providence Health System-Oregon*, 351 Or 587, 589, 273 P3d 106 (2012) ("When reviewing a trial court order granting a motion to dismiss, we accept as true all well-pleaded facts in the complaint."). Plaintiff's husband, decedent, was accidentally shot and killed by a friend during a camping trip. Plaintiff filed a claim for life insurance policy benefits, and defendant initially denied plaintiff's claim on the ground that decedent's death fell within a policy exclusion for deaths "caused by or resulting from [decedent] being under the influence of any narcotic or other controlled substance"—apparently based on the fact that decedent had had marijuana in his system at the time of his death.

Plaintiff filed this action against defendant,[1] alleging claims for breach of contract, breach of an implied contractual covenant of good faith and fair dealing, and negligence. Plaintiff sought both economic damages—the benefits payable under the policy—and emotional distress damages.

---

[1] The complaint named other defendants who have since been dismissed from the case.

In her negligence claim, plaintiff alleged that defendant had contracted with her husband and her to provide life insurance coverage and benefits, that an Oregon statute requires "[d]efendant to follow a standard of care in the performance of its insurance contracts independent of, in addition to, and outside of the terms of the insurance contract," and that:

> "Defendant Insurance Company negligently performed its obligations under [ORS] 746.230 in its review, investigation, and eventual decision to deny insurance benefits following the death of [plaintiff's husband] in one or more of the following ways:

> "(a)  By refusing to pay the insurance benefits without conducting a reasonable investigation based on all available information, in violation of [ORS] 746.230(1)(d); and

> "(b)  Not attempting, in good faith, to promptly and equitably settle a claim in which the insurer's liability has become reasonably clear, in violation of [ORS] 746.230(1)(f)."

Plaintiff further alleged that defendant "knew, or in the exercise of reasonable care as a corporation engaged in the business of marketing and selling insurance, should have known, that one or more of its foregoing acts or omissions would create an unreasonable risk of harm to the beneficiaries of its insured, including [plaintiff]." Finally, plaintiff alleged that, as a result of defendant's negligence, she had suffered "the noneconomic loss of increased emotional distress and anxiety caused by having fewer financial resources to navigate the loss of a bread-winning spouse."

Defendant filed motions to dismiss plaintiff's claims for negligence and breach of the implied covenant of good faith and fair dealing and to strike the allegations seeking damages for emotional distress, arguing that plaintiff's only remedy under Oregon law was contractual. The trial court granted those motions and entered a limited judgment dismissing all but the breach of contract claim. Plaintiff appealed the limited judgment but, while the appeal was pending, she filed an amended complaint that alleged only breach of contract and sought only the amount of benefits payable under the insurance policy—$3,000. Thereafter, defendant paid the $3,000 to plaintiff, the parties stipulated to the entry of a judgment in favor of plaintiff and against

defendant, and the trial court entered a conforming general judgment.

## II.  THE COURT OF APPEALS DECISION

Meanwhile, plaintiff's appeal from the limited judgment, which challenged the dismissal of her negligence claim and the striking of her allegations of emotional distress damages, proceeded in the Court of Appeals. That court ultimately reversed the trial court's ruling, holding that plaintiff could bring a claim for "negligence *per se*" and seek emotional distress damages based on defendant's violations of ORS 746.230(1). In its opinion, the Court of Appeals broadly described the issue before it as requiring it to determine "when a party to a contract may sue another party to the same contract for negligence." *Moody*, 317 Or App at 237. After noting that, ordinarily, the sole remedy for a party's failure to meet a contractual obligation is an action for breach of the contract, the court observed that, in specific circumstances, an injured party also may have a negligence claim, quoting the following passage from *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992):

> "'When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence *if the other party is subject to a standard of care independent of the terms of the contract*.'"

*Moody*, 317 Or App at 237 (emphasis added). The Court of Appeals then observed that an independent standard of care may arise out of a special relationship between the contracting parties,[2] but it also may be expressed in a statute or administrative rule. *Id.* at 237-38. The court relied—for that latter suggestion—on its own opinion in *Abraham v. T. Henry Construction, Inc.*, 230 Or App 564, 567, 573-74, 217

---

[2] As an example of such a "special relationship," the Court of Appeals offered the relationship between the parties in *Georgetown Realty*—a liability insurer and its insured. *Moody*, 317 Or App at 237. The court explained that when such insurers undertake to defend their insureds, the insureds hand over control of their defenses to their insurers, creating a special fiduciary relationship between the parties. *Georgetown Realty*, 313 Or at 110-11.

P3d 212 (2009) (*Abraham I*), *aff'd on other grounds*, 350 Or 29, 249 P3d 534 (2011) (*Abraham II*), which held that a couple who had discovered water leakage and resulting damage in a home that had been built for them under a construction contract could sue the construction company, not only for breach of contract, but also in tort, reasoning that the Oregon Building Code provided "an independent standard of care sufficient to support a claim for negligence *per se*."[3] *Moody*, 317 Or App at 237 (discussing *Abraham I*).

However, the court acknowledged, the violation of an independent standard of care is not all that is required to state a negligence claim against another party to a contract. According to the Court of Appeals, a negligence claim based on a statutory violation requires a plaintiff also to plead and ultimately prove that

"'(1) defendants violated a statute; (2) that plaintiff was injured as a result of that violation; (3) that plaintiff was a member of the class of persons meant to be protected by the statute; and (4) that the injury plaintiff suffered is of a type that the statute was enacted to prevent.'"

*Moody*, 317 Or App at 238 (quoting *McAlpine v. Multnomah County*, 131 Or App 136, 144, 883 P2d 869 (1994), *rev den*, 320 Or 507 (1995)).

After briefly outlining how that test appeared to be satisfied by plaintiff's allegations that she had been injured as a result of defendant's violation of an Oregon statute, particularly ORS 749.230(1)(d) and (f), the Court of Appeals addressed several objections that defendant had levelled against that approach. Of particular note, the court:

---

[3] This court affirmed the Court of Appeals decision in *Abraham I* on a different ground: We concluded that the plaintiff could bring a claim for ordinary common-law negligence against the builder and, thus, we did not decide whether the plaintiff could bring a claim for negligence *per se* based on the builder's violation of the Oregon Building Code. In doing so, we expressly agreed with the Court of Appeals that, when a plaintiff claims to have suffered damages as a result of the defendant's negligent performance of contractual obligations, that negligence claim may be viable, notwithstanding the contractual relationship between the parties, if the other party is subject to a standard of care that is independent of the terms of the contract. *Abraham II*, 350 Or at 39-40. We also agreed that a standard of care might be deemed "independent" for that purpose, "either because a 'special relationship' imposes a heightened standard of care *** or because the common law, statutes, or administrative rules impose liability regardless of the contractual relationship between the parties." *Id.* at 40.

(1) rejected defendant's contention that this court's decision in *Farris v. U.S. Fid. and Guar. Co.*, 284 Or 453, 587 P2d 1015 (1978) (*Farris II*), forecloses any negligence *per se* claim based on a violation of ORS 746.230(1), 317 Or App at 243-46; (2) rejected defendant's contention that, for a negligence *per se* claim to stand, a plaintiff also must have a common-law negligence claim, *id.* at 241-43; and (3) rejected defendant's contention that the emotional injury that plaintiff had alleged that she had suffered was not of a type that ORS 746.230(1) was enacted to prevent, *id.* at 246-47. Having disposed of those objections and having previously concluded that plaintiff's allegations of negligence *per se* based on ORS 746.230(1) satisfied the "test" that it had created in *McAlpine* for when a statutory violation supports a negligence *per se* claim, the Court of Appeals reversed, holding that the trial court had erred in dismissing plaintiff's negligence *per se* claim and striking her allegation of emotional distress damages. *Id.* at 248. Defendant petitioned for, and we allowed, review.

## III. ARGUMENTS AND ANALYSIS

We begin our analysis with the premise, acknowledged by both parties, that, in addition to contract claims, parties to a contract may assert viable tort claims. Contract and tort claims are conceptually different and provide remedies for breach of conceptually different obligations: "Contract obligations are based on the manifested intention of the parties to a bargaining transaction, whereas tort obligations are imposed by law—apart from and independent of promises made and therefore *apart from the manifested intention of the parties*—to avoid injury to others." *Abraham II*, 350 Or at 36 (emphasis in original; internal quotation marks omitted).

In this case, plaintiff takes the position that her claim for common-law negligence is analogous to the plaintiffs' common-law negligence claim in *Abraham II* against the builder of their home for water damage from a leak. Plaintiff argues that she is entitled to bring a common-law negligence claim against defendant for its failure to act reasonably in performing the obligations of a life insurer and that she is entitled to recover the emotional distress

damages that she alleges. To support those arguments, plaintiff invokes a statute—ORS 746.230.

For its part, defendant accepts our holding in *Abraham II* and does not contend that the fact that defendant and plaintiff have an insurance contract forecloses plaintiff's negligence claim. Rather, defendant counters that, to rely on *Abraham II*, plaintiff must establish that she is entitled to bring a common-law negligence claim. The crux of defendant's argument is that plaintiff does not have a legally cognizable common-law negligence claim for the emotional distress damages that she alleges. According to defendant, that is so for three independent reasons: (1) in *Farris II*, this court decided that the legislature did not intend to permit a common-law negligence claim against a first-party insurer; (2) even if *Farris II* does not resolve the question, this court should conclude that, in enacting ORS 746.230, the legislature deliberately decided not to provide a basis for a negligence clam against a first-party insurer or to supply a standard of care for a negligence *per se* claim; and (3) plaintiff does not have a legally protected interest sufficient to subject defendant to liability for emotional distress damages. According to defendant, it is not enough for plaintiff to establish that defendant violated a statute—a claim of "negligence *per se*," as plaintiff and the Court of Appeals describe it; rather, plaintiff must demonstrate that she has a legally cognizable common-law negligence claim, and she must plead its elements. Critical to an analysis of each of those arguments is the question whether plaintiff has alleged facts sufficient to state a legally cognizable common-law negligence claim for emotional distress damages.[4] That is an important question of first impression, and that is where we begin.

---

[4] In her negligence claim, plaintiff sought to recover damages for both emotional distress and economic loss. Specifically, as to the latter, plaintiff alleged that, as a result of defendant's negligence, she suffered an economic loss in the amount of $3,000—the amount of the contractual benefit to which plaintiff was entitled. Whether plaintiff would be entitled to maintain a negligence claim for such damages also is an open question. However, in this case, we need not address it. Here, plaintiff sought those same damages in her contract claim, and it is undisputed that they were awarded. In its briefing to us, defendant does not make any argument about whether plaintiff would have a common-law negligence claim for such economic loss. Accordingly, that question is not presented, and we do not decide it.

A.   *Negligence* per se *claim depends on a viable common-law negligence claim.*

As set out above, the Court of Appeals viewed plaintiff's negligence claim as a claim "based on a statutory violation" and opined that, to make out that claim—a claim that the court described as "negligence *per se*"—plaintiff was required to plead, and ultimately prove, the following elements:

> "'(1) defendants violated a statute; (2) that plaintiff was injured as a result of that violation; (3) that plaintiff was a member of the class of persons meant to be protected by the statute; and (4) that the injury plaintiff suffered is of a type that the statute was enacted to prevent.'"

*Moody*, 317 Or App at 238 (quoting *McAlpine*, 131 Or App at 144).

Defendant contests that conclusion, maintaining that a negligence *per se* claim can be proved in that way only when, as this court stated in *Deckard v. Bunch*, 358 Or 754, 761 n 6, 370 P3d 478 (2016), "a negligence claim *otherwise exists*" (emphasis added).[5] And in this case, defendant argues, a negligence claim for violation of an insurance statute does *not* "otherwise exist."

Defendant is correct that a negligence *per se* claim is not a separate type of negligence claim with its own elements; rather, negligence *per se* is "simply shorthand for a negligence claim in which the standard of care is expressed by a statute or rule." *Abraham II*, 350 Or at 35 n 5. *See also Bob Godfrey Pontiac v. Roloff*, 291 Or 318, 325, 630 P2d 840 (1981) (describing an action for negligence *per se* as an example of a kind of case "in which liability would be based upon violation of a statutory duty *when there is also an underlying common law cause of action*") (emphasis added); Caroline Forell, *Statutory Torts, Statutory Duty Actions, and Negligence Per Se: What's the Difference?*, 77 Or L Rev 497, 529 (1998) (stating that "[n]egligence *per se* is

---

[5] As discussed, the Court of Appeals rejected defendant's contention that, for a negligence *per se* claim to stand, a plaintiff also must have a common-law negligence claim, on the ground that that contention was unsupported by any pertinent case law. *Moody*, 317 Or App at 241-43. As we explain, the Court of Appeals was incorrect on that point.

traditionally only available where a plaintiff would also have a common-law negligence action against the defendant").

In *Deckard*, we again referred to negligence *per se* as a "shorthand descriptor" of a negligence claim that otherwise exists, where the standard of care is expressed by statute or rule and a violation of the statute or rule establishes a presumption of negligence:

> "Negligence *per se* \*\*\* is a shorthand descriptor for a negligence claim in which the standard of care is expressed by a statute or rule. \*\*\* When a negligence claim otherwise exists, and a statute or rule defines the standard of care expected of a reasonably prudent person under the circumstances, a violation of that statute or rule establishes a presumption of negligence."

358 Or at 761 n 6 (internal quotation marks omitted). And in *Shahtout v. Emco Garbage Co.*, 298 Or 598, 601, 695 P2d 897 (1985), we made the same point:

> "In a negligence case, the plaintiff must show that defendant did not meet an applicable standard of due care under the circumstances. When a plaintiff (or a defendant seeking to prove negligence on plaintiff's part) invokes a governmental rule in support of that theory, the question is whether the rule, though it was not itself meant to create a civil claim, nevertheless so fixes the legal standard of conduct that there is no question of due care left for a factfinder to determine; in other words, that noncompliance with the rule is negligence as a matter of law."

Thus, defendant is correct that, to make out a claim of negligence *per se* and take advantage of a presumption of negligence arising from a statutory violation, a plaintiff must show not only that the statute sets out an applicable standard of care, but also that the plaintiff has an existing negligence claim.

Our agreement with defendant on that issue does not, however, resolve this case. Although the Court of Appeals rested its decision on the idea that a plaintiff can bring a claim for negligence *per se* even if the plaintiff does not have an existing negligence claim, and the parties' arguments are primarily directed to that point, plaintiff's complaint and the ruling of the trial court require that we

decide whether plaintiff pleaded a cognizable common-law negligence claim. As noted, plaintiff brought a claim for negligence and alleged that an Oregon statute requires defendant to follow a standard of care "independent of, in addition to, and outside of the terms of the insurance contract"; that defendant negligently failed to perform its obligations; that defendant knew, or in the exercise of reasonable care should have known, that one or more of its acts or omissions would create an unreasonable risk of harm to plaintiff; and that plaintiff suffered emotional distress damages as a result. Defendant filed a motion to dismiss that claim, arguing that plaintiff's only remedy was for breach of contract, and the trial court granted that motion. To decide whether the trial court erred in doing so, we must decide whether plaintiff's negligence claim "otherwise exists," or, in other words, is legally cognizable.

B.  *To have a viable common-law negligence claim, plaintiff must establish that she has a "legally protected interest" sufficient to subject defendant to liability for purely emotional damages.*

With respect to that key question, plaintiff contends that she has alleged the requisite elements of a negligence claim—in other words, that defendant engaged in conduct that "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff," *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987)—and that that conduct in fact caused her economic harm and emotional distress. Plaintiff contends that she is entitled to seek emotional distress damages because defendant's conduct infringed on her statutorily protected interest in avoiding the wrongful denial, delay, and evaluation of her insurance claim.

In *Fazzolari*, this court stepped away from traditional concepts of "duty," "breach of duty," and "proximate cause" as aids to determine whether a plaintiff could maintain a claim for negligence and, instead, the court reformulated the relevant question as whether the defendant's "conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." 303 Or at 17; *see also Scott v. Kesselring,* 370 Or 1, 10, 513 P3d 581, 589 (2022)

(discussing reformulation of the traditional tort principles of duty, breach, and proximate cause in *Fazzolari*). It is now settled that

> "[a] negligence complaint, to survive a motion to dismiss, must allege facts from which a factfinder could determine (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent."

*Solberg v. Johnson*, 306 Or 484, 490-91, 760 P2d 867 (1988). The dispute here centers on whether plaintiff has alleged a foreseeable risk to "a protected interest" sufficient to subject defendant to liability for emotional distress damages.

1. *Legally protected interests previously recognized by this court*

Perhaps the simplest legally protected interest is in being "free from physical harm at the hands of another." *Philibert v. Kluser*, 360 Or 698, 703, 385 P3d 1038 (2016). Physical harm includes both bodily injury and property damage.[6] Generally, however, people do not have a legally protected interest in being free from emotional distress, and, to date, this court has permitted common-law tort claims for emotional distress damages only in the following three circumstances: (1) when the defendant also physically injures the plaintiff; (2) when the defendant intentionally causes the emotional distress; or (3) when the defendant "negligently causes foreseeable, serious emotional distress and also infringes some other legally protected interest." *Id.* at 702; *see also Hammond v. Central Lane Communications Center*, 312 Or 17, 22, 816 P2d 593 (1991) (stating that the court had recognized negligence claims for "psychic injury" in those three circumstances). In that third category of cases, this court has looked for a legal source of liability other than

---

[6] To say that a person has an actionable claim for property damage, as in *Abraham II*, is equivalent to saying that the person has a legally protected interest in being free from that harm.

foreseeability: "[T]he injury's foreseeability, standing alone, is insufficient to establish the defendant's liability[;] there must also be another 'legal source' of liability for the plaintiff to recover emotional distress damages." *Philibert*, 360 Or at 703.

In *Philibert*, this court was asked to consider whether two brothers who had watched their third brother die in a collision had stated a negligence claim for the emotional distress damages that they had alleged. We began our analysis by explaining the reason that the court is generally reluctant to recognize common-law negligence claims for emotional distress damages:

> "In contrast to physical harms, emotional harms occur frequently. *** Any number of people may suffer emotional distress as the foreseeable result of a single negligent act. The *Restatement* provides an example: 'a negligent airline that causes the death of a beloved celebrity can foresee genuine emotional harm to the celebrity's fans, but no court would permit recovery for emotional harm under these circumstances.' For that reason, foreseeability, standing alone, is not a useful limit on the scope of liability for emotional injuries. In *Harris v. Suniga*, 344 Or 301, 180 P3d 12 (2008), this court explained that allowing recovery for *economic* loss on the basis of foreseeability, without requiring more, would invite, in the words of Judge Cardozo, 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.' Emotional distress, like economic loss, ripples throughout society as a foreseeable result of negligent conduct. Without some limiting principle in addition to foreseeability, permitting recovery for emotional injuries would create indeterminate and potentially unlimited liability."

*Philibert*, 360 Or at 703-04 (some citations omitted; emphasis in original). Nevertheless, we explained, recovery for foreseeable emotional damage is permitted "when the defendant's conduct 'infringed some legally protected interest apart from causing the claimed distress.'" *Id*. at 704. And, in the context of emotional distress, we defined a legally protected interest as "an independent basis of liability separate from the general duty to avoid foreseeable risk of harm." *Id*. We then reviewed the circumstances in which we had recognized the existence of such an interest. Those circumstances included those

in which a plaintiff had alleged (1) a right against certain wrongful invasions of privacy, such as the invasion discussed in *Hinish v. Meier & Frank Co.*, 166 Or 482, 506, 113 P2d 438 (1941) (allowing claim for emotional distress when plaintiff's name was signed without his consent on a telegram to the governor); (2) a right to have a party comply with an obligation found in a court order or statute designed to protect the plaintiff from the type of emotional harm that occurred, such as the statute at issue in *Nearing v. Weaver*, 295 Or 702, 708, 670 P2d 137 (1983) (right to have officers comply with statute requiring arrest to protect victims of domestic violence) and the order at issue in *McEvoy v. Helikson*, 277 Or 781, 787-89, 562 P2d 540 (1977) (right to have lawyer comply with order requiring retention of child's passport to protect father's interest in child's custody); and (3) certain other common-law rights such those recognized in *Macca v. Gen. Telephone Co. of N.W.*, 262 Or 414, 418, 495 P2d 1193 (1972) (right to be free from private nuisance) and *Hovis v. City of Burns*, 243 Or 607, 613, 415 P2d 29 (1966) (right to have the remains of a deceased spouse remain undisturbed). *Philibert*, 360 Or at 705-06.

Turning to the claim before the court in *Philibert*, we described the harm that the plaintiffs had alleged as a "palpable and distinct harm, different in kind even from the emotional distress that comes with the inevitable loss of our loved ones," and we held that the defendant's failure to protect against that harm was "a violation of [the plaintiffs'] interest in not witnessing such a shocking and tragic event." *Id.* at 707. Finally, we analogized the plaintiffs' common-law interest in being free from that kind of injury to the interests at issue in two decisions in which "the court [had] determined that an asserted common law interest [was] sufficiently important to support the imposition of liability" for emotional injury—the negligent handling of a spouse's remains in *Hovis* and the unauthorized political use of the plaintiff's signature in *Hinish*—and concluded that "the interest in avoiding being a witness to the negligently caused traumatic injury or death of a close family member is similarly important." *Philibert*, 360 Or at 707.

That was not the end of our analysis, however. We proceeded to carefully "frame the contours of that interest

and identify the elements that will allow a bystander to recover for the negligent infliction of emotional distress, while also providing a limiting principle that will avoid potentially unlimited claims or damages." *Id.* at 708. We decided to limit bystander emotional injury claims to those where (1) the bystander perceives the event contemporaneously and (2) is a close family member of the person suffering the bodily injury. *Id.* at 711. In doing so, we recognized that our rule left open the possibility of "false or inflated claims," but we ultimately concluded that that possibility should not be an impediment to claims like the plaintiffs', stating,

> "Juries are charged with discerning truth from self-serving fiction when plaintiffs testify about their own injuries and are as competent to do this in claims for emotional injuries as they are in other cases. *** Laws also may be structured to deter false claims by sympathetic plaintiffs whose charisma may evoke inconsistent and unpredictable jury verdicts."

*Id.* at 714-15 (citations omitted). We imposed the requirements of personal observation of the injury and injury to a close relative because, "on the basis of human experience," we considered them to be "objective indicators of possibly serious emotional injury," and therefore more likely to be genuine. *Id.* at 715. Further, and in response to the concern that aspects of our rule could seem arbitrary, we noted "the need to provide *ex ante* understanding of liability and assistance in the orderly administration of justice." *Id.* at 715-16. So articulated, we were convinced that our rule would not create a risk of "indeterminate and potentially unlimited liability." *Id.* at 704.

Two years after deciding *Philibert*, this court again took up a question of whether the plaintiffs had pleaded facts sufficient to state common-law negligence claims for emotional distress damages. In *Tomlinson v. Metropolitan Pediatrics, LLC*, 362 Or 431, 434, 412 P3d 133 (2018), one set of plaintiffs were parents who had alleged that the defendant physicians had failed to timely diagnose their older son, M's, genetic disorder and failed to inform the parents of that disorder. The parents had alleged that, had the defendants not failed to act, the parents would not have produced another child with the same disorder. We described the legal

question there as "whether the complaint alleged sufficient facts to establish that defendants' conduct was negligent with respect to the legally protected interests of the parents." 362 Or at 440.

In engaging that issue, we began by noting that the parents and the defendants did not have a patient-physician relationship. At the same time, we also noted that lack of privity has not always been a bar to claims against professional service providers and that "we decide on a case-by-case basis whether a professional's relationship with a third party is capable of supporting a negligence claim." *Id.* at 446. We reasoned that the parents had alleged facts that, if proved, would establish that (1) the defendants and the parents had a mutual expectation that the defendants would provide the parents with information that implicated the parents' right and ability to make informed reproductive choices; (2) meeting that expectation would not impose an undue burden on the defendants beyond the obligation that they already owed to their patient, M; and (3) protecting the parents' interest would not be detrimental to the interests of M. We concluded that those factual allegations were sufficient, if proved, to establish that, in addition to their obligation to protect M's interest, defendants also had a limited obligation to protect the parents' interests. *Id.* at 450.

We then addressed the defendants' argument that, even if the parents were permitted to pursue a common-law negligence claim in the alleged circumstances, they were not entitled to recover emotional distress damages. We responded by stating the general rule that, when a plaintiff establishes a cognizable negligence claim, damages are recoverable to the extent necessary to make the plaintiff whole. *See id.* at 452 (citing *United Engine Parts v. Ried*, 283 Or 421, 432, 584 P2d 275 (1978) ("The purpose of awarding compensatory damages is to make the party entitled thereto whole.") (Internal citation and quotation marks omitted.)). We also cited *Philibert*, 360 Or at 702, for the proposition that, when a plaintiff alleges negligence and claims either physical injury or the invasion of some legally protected interest, then, generally speaking, the plaintiff can recover for all forms of suffering, including both physical and emotional

distress damages. *Tomlinson*, 362 Or at 452. Ultimately, in *Tomlinson,* we concluded that the same legally protected interest that permitted the parents' negligence claim also permitted the parents to seek emotional distress damages. *Id.* at 454. We explained that the parents had alleged facts that, if proved, could establish a legally protected interest in receiving information from the defendants that implicated the parents' reproductive choices and their interest in avoiding emotional harm. *Id.* at 452, 452 n 9.

   2.   *Whether plaintiff here has alleged a legally protected interest sufficient to subject defendant to liability for purely emotional damages*

      In the case now before us, we must consider, as we did in *Philibert* and *Tomlinson* and the cases that preceded them, whether plaintiff has alleged a legally protected interest sufficient to subject defendant to liability for emotional distress damages. We therefore repeat the material allegations of her complaint.

      Plaintiff alleges that defendant contracted with her husband and her to provide life insurance coverage and benefits and agreed to pay $3,000 in the event that plaintiff's husband died as the result of an accident. Plaintiff alleges that her husband died as a result of an accident, but that defendant negligently failed to pay the promised benefits by failing to conduct "a reasonable investigation based on all available information" and by "[n]ot attempting, in good faith, to promptly and equitably settle a claim in which the insurer's liability has become reasonably clear." Plaintiff alleges that defendant "knew, or *** should have known, that one or more of its foregoing acts or omissions would create an unreasonable risk of harm to the beneficiaries of its insured, including [plaintiff]." And finally, plaintiff alleges that, as a result of defendant's negligence, she had fewer financial resources to navigate the loss of a bread-winning spouse and that she suffered increased emotional distress and anxiety as a result. Thus, the interest that plaintiff seeks to have us recognize as legally protected and sufficient to subject defendant to liability for emotional distress damages is her interest, as the surviving spouse of a deceased breadwinner, in having the insurance company with which

she and her husband had contracted for life insurance bene-
fits conduct a reasonable investigation of, and promptly pay,
her claim for the promised benefits.

   To decide whether that alleged interest is a legally
protected interest sufficient to subject defendant to liabil-
ity for emotional distress damages, we begin, as we did in
*Philibert,* by acknowledging that this court is hesitant to
permit recovery for solely emotional injury but has neverthe-
less done so in limited circumstances. We have not devised
a "test" for determining when an interest is so protected;
rather we have looked for factors that demonstrate, to our
satisfaction, that we will not be creating "indeterminate
and potentially unlimited liability," and that the interest in
question is "sufficiently important" and sufficiently circum-
scribed to support the imposition of liability for emotional
distress damages. *Philibert*, 360 Or at 704, 707. We acknowl-
edge that such an analysis requires an application of judg-
ment, but that is the nature of the common law. It requires
that we proceed incrementally, looking at our past decisions
and applying similar reasoning to new circumstances. *See,
e.g.*, *Deep Photonics Corp. v. LaChapelle*, 368 Or 274, 288-
89, 491 P3d 60 (2021) (stability and consistency are critical
aspects of common-law decision-making; court's decision
comported with that standard because the changes it made
to the common law were "marginal, incremental, and clearly
foreshadowed by our prior decisions"). We therefore proceed
to consider the factors that have been important to us in our
past decisions.

   a.   Whether an Oregon statute indicates the exis-
        tence of the alleged legally protected interest.

   In this case, plaintiff invokes a statute in support
of her argument that she has a sufficient legally protected
interest, and she cites *Philibert* and its discussion of the
second category of circumstances in which this court has
recognized a legally protected interest sufficient to permit
a claim for such damages—"when another party has a legal
duty 'designed to protect plaintiff[] against the type of harm
which * * * occurred.'" 360 Or at 705 (quoting *Nearing*, 295
Or at 708). In *Nearing*, the plaintiff had filed a common-law

negligence claim seeking to recover for the emotional distress that she had suffered when police officers failed to arrest her ex-spouse, who had been caught violating a restraining order. This court permitted the plaintiff's claim and described her legally protected interest as arising from a statute establishing "a legal duty designed to protect the plaintiff from the type of emotional harm that occurred." *Philibert*, 360 Or at 706; *Nearing*, 295 Or at 708. Here, plaintiff argues that, like the statute in *Nearing*, ORS 746.230(1) imposes a legal obligation designed to protect insureds and thus supports plaintiff's argument that she has pleaded the required legally protected interest.

In considering plaintiff's argument, we are met with defendant's argument that in *Farris II*, this court decided that the legislature did not intend to permit a common-law negligence claim against a first-party insurer, as well as the dissent's view that, in deciding as it did in *Farris II*, this court foreclosed plaintiff's common-law negligence claim. *See* 371 Or at 824 (Garrett, J., dissenting). In response to defendant, we first observe, as noted, that plaintiff does not ask us to hold that, in enacting ORS 746.230, the legislature intended to create a statutory tort. Plaintiff does not argue that the legislature expressly or impliedly intended to create a private right of action for violation of ORS 746.230. *See Doyle v. City of Medford*, 356 Or 336, 344, 337 P3d 797 (2014) ("Statutory liability arises when a statute either expressly or impliedly creates a private right of action for the violation of a statutory duty."); *Deckard*, 358 Or at 759 (same).[7] When the legislature intends to impose liability for violation of a statute, the elements of that statutory claim are determined by the legislature, and that claim is distinct from any other common-law claim that a party may have, including a common-law negligence claim. *Deckard*, 358 Or at 761.

---

[7] We sometimes refer interchangeably to "statutory liability" and "statutory tort." *Compare Doyle*, 356 Or at 344 ("statutory liability" arises when statute creates private right of action), *with Scovill v. City of Astoria*, 324 Or 159, 163, 921 P2d 1312 (1996) (referring to such claims as "statutory tort" claims), and *Gattman v. Favro*, 306 Or 11, 15, 757 P2d 402 (1988) (same). However, we have made clear that a claim of statutory liability is not necessarily a tort. *Deckard*, 358 Or at 761 n 7 ("[A] claim created by the legislature is not necessarily even a tort claim."); *Bellikka v. Green,* 306 Or 630, 635, 762 P2d 997 (1988) ("[s]tatutory liability is not necessarily 'tort' liability").

Here, the claim that plaintiff alleges is not a statutory tort; rather, it is a common-law negligence claim.

Relatedly, plaintiff does not ask this court to create or recognize a type of tort liability different from the tort of common-law negligence. As explained in *Burnette v. Wahl*, 284 Or 705, 711-12, 588 P2d 1105 (1978), creating a tort based on a statutory violation is an approach that is open to us when we deem it necessary or desirable:

> "When neither the statute nor the common law authorizes an action and the statute does not expressly deny it, the court should recognize that it is being asked to bring into existence a new type of tort liability on the basis of its own appraisal of the policy considerations involved. *** If a civil cause of action based upon a statute is established by a court, it is because the court, not the legislature, believes it is necessary and desirable to further vindicate the right or to further enforce the duty created by statute."

*See also Bob Godfrey Pontiac*, 291 Or at 332; *Miller v. City of Portland*, 288 Or 271, 277-78, 604 P2d 1261 (1980) (both discussing availability of such an approach). But that is not the approach that we consider today. Here, our task is to decide whether plaintiff has alleged a legally protected interest sufficient to state a common-law claim for negligence and to subject defendant, a first-party insurer, to liability for emotional distress damages.

That description of our task also explains the reason that we disagree with the dissent. In *Farris II*, this court did not consider whether the plaintiff had alleged a legally viable claim against a life insurer for breach of an extracontractual obligation. The plaintiffs in *Farris II* were not individuals who brought a negligence claim against a first-party life insurer. Instead, the plaintiffs in *Farris II* were partners in a sandwich shop who alleged that they had been sued by a business competitor for unfair business practices; that they had tendered the defense to the defendant, a third-party insurer; and that the defendant had refused to defend them in breach of its contract and in bad faith, causing them emotional distress as well as economic harm.[8] The

---

[8] The dissent notes that the plaintiffs' complaint in *Farris II* included two causes of action, 371 Or at 811-12 (Garrett, J., dissenting), but this court did not draw a distinction between them in arriving at its understanding of the nature

court described the issue before it as a question "whether damages for emotional suffering may be awarded in a case of this kind"—that is, a case involving a claim that the defendant had breached its contract in "bad faith":

> "There is no doubt that defendant was guilty of a clear breach of its contract. Plaintiffs contend that defendant is guilty of a tort as well as a breach of contract because it exercised 'bad faith' in its decision to deny coverage and to refuse a defense. The generally accepted rule is that emotional distress caused by pecuniary loss resulting from breach of contract is not recoverable."

*Farris II*, 284 Or at 455-56. Thus, the court said, it "becomes important (according to the usual doctrine) whether plaintiffs' action for damages is one of contract or one of tort." *Id.* at 456.

The next step in the court's analysis was to set out the text of ORS 746.230 and the penalties for violating that provision. Immediately after doing so, the court said the following:

> "It is possible to contend that defendant's violation of the statute is a tort, and, therefore, plaintiffs are entitled to recovery for emotional distress as well as for their other damages. It is not our understanding that plaintiffs make this contention. It is evident from the statutes that it was the intention of the legislature to prohibit insurance companies from intentionally breaching their contract to settle their insureds' claims as defendant did here and to inflict certain consequences for so doing. However, such conclusion does not dispose of the question whether damages for emotional suffering were intended to be recoverable by an

---

of the complaint. The reason may be that the two causes of action both allege the same breach of contract and neither alleges the breach of an extracontractual standard of care. We have only the abstract of record and do not know how either cause of action was denominated in the complaint. We do know, though, that in both causes of action, the plaintiffs alleged, in the same terms, that the defendant had denied coverage and that "[t]his denial of coverage and refusal to defend was a breach of the insurance policy issued by defendant and the denial and refusal were not made in good faith." In both causes of action, the plaintiffs sought the same economic and emotional distress damages. In the first, the plaintiffs also sought attorney fees; in the second, the plaintiffs also sought punitive damages, adding an allegation that the defendant's rejection of coverage and refusal to defend plaintiffs "was made with the knowledge that such action would inflict mental distress and anguish upon plaintiffs." In neither did the plaintiffs assert, generally, that the defendant's actions were in breach of an extracontractual standard of care or, in particular, that the defendant's actions were negligent.

insured for such a breach. Because the statutes did provide for the payment of damages not usually recoverable in such a situation, it would appear that had the legislature intended to enlarge the damages further, it would have so provided. It was certainly not intended by the legislature that additional pressure to perform the contract be exerted by allowing the recovery of damages for emotional distress, since the statute provides for civil damages recoverable by the state for that purpose. There is nothing to indicate that the legislature intended, when it prohibited certain claims settlement practices in ORS 746.230, that actions for breach of insurance contracts would be transformed, in all of the covered instances, into tort actions with a resulting change in the measure of damages. The statutes express no public policy which would promote damages for emotional distress. Concern about the insured's peace of mind does not appear to be the gravamen of the statutory policy."

*Farris II*, 284 Or at 457-58.[9] We understand that paragraph to explain that the plaintiff's claim was a claim for breach of contract and that, in enacting ORS 746.230, the legislature did not intend to provide "tort"—or emotional distress—damages for such a claim.

The court then went on to consider whether, as a matter of common law, a claim based on a "bad faith" breach of a contractual obligation should be considered a claim sounding in tort. After discussing various California court decisions, the court rejected that view, specifically holding that the plaintiffs' claim was one for breach of contract:

"Contrary to the California holdings, * * * we believe defendant's failure to undertake representation of plaintiffs which required them to represent themselves could only have been a breach of contract, and, in cases of breach, the law is clear that no recovery for mental distress because of threat of pecuniary loss is recoverable."

*Id.* at 464-65.

___

[9] The Court of Appeals concluded that, because the court in *Farris II* had stated, after introducing the issue, that "[i]t is not our understanding that plaintiffs make this contention," the court's subsequent discussion and conclusion that the legislature did not intend to create a private right of action for the violation of the statute were merely *dictum. Moody*, 317 Or App at 243-44 (citing *Farris II*, 284 Or at 458). We do not agree with that assessment of the *Farris II* decision. The court clearly intended to foreclose the statutory tort "contention," whether or not the plaintiffs had meant to raise it.

Finally, the court considered the plaintiffs' arguments that, even if their claim was for breach of contract, they should be permitted to recover emotional distress damages because "one who enters into a contract of insurance does so to guarantee himself peace of mind in case an action or claim is made against him and, therefore, he should receive reimbursement for that for which he has bargained and not received," and "the insurance business is tinged with a public interest similar to that of a public utility, and public policy dictates that full responsibility for the results of failure to perform should be imposed without respect to the rules applicable to other contracting parties." *Id.* at 465-66. The court disagreed, adhering to "the universal rule" that recovery for breach of contract does not include recovery for emotional distress damages. *Id.*

In *Farris II,* this court understood its task as deciding *whether* the plaintiffs' claim was "one of contract or one of tort," holding, as indicated, that the plaintiffs' claim was for breach of contract.[10] *Farris II*, 284 Or at 456, 463. In arguing otherwise, the dissent contends that the complaint at issue in *Farris II* could be understood as alleging one count for breach of contract and one count in tort. 371 Or at 819

---

[10] That this court understood the plaintiffs' claim to be one in contract is also clear from its prior decision. *Farris v. U.S. Fidelity & Guaranty*, 273 Or 628, 542 P2d 1031 (1975) (*Farris I*). There, the court held that an unaggravated breach of contract could not support a claim for emotional distress damages, and it stated that it did not decide whether such damages would be available for "an aggravated breach." *Id.* at 638. Thus, it makes sense that, in *Farris II*, the issue before the court would be whether emotional distress damages would be available for the aggravated breach of contract that the plaintiffs apparently attempted to plead and not whether such damages would be available for breach of an *extra-contractual* obligation to avoid injuries to others.

We also disagree with the dissent's contention that this court "has repeatedly characterized *Farris II* as declining to recognize a tort." __ Or at __ (Garrett, J., dissenting) (slip op at 13:16-17). The two cases that the dissent cites, *Georgetown Realty* and *Goddard v. Farmers Ins. Co.*, 344 Or 232, 179 P3d 645 (2008), describe this court's holding in *Farris II* as we do here—that is, as holding that the plaintiff's claim in *Farris II* was for breach of contract and that, as a result, tort damages were not recoverable. In *Georgetown Realty*, for example, the court stated,

"The issue for decision in [*Farris II*] was whether damages for mental anguish and punitive damages are recoverable in a contract action against the insurer. The court again noted 'that the present action is not one in tort.'"

*Georgetown Realty*, 313 Or at 108 (citing *Farris II*, 284 Or at 460); *Goddard*, 344 Or at 264 ("The court [in *Farris II*] concluded that such denials of coverage are a breach of contract only and support only normal contract damages.").

(Garrett, J., dissenting). That stretch cannot hold. As noted, both counts expressly alleged a breach of contract and both sought the same economic and emotional distress damages. And, most importantly, the difference between contract and tort claims is that they provide remedies for breach of conceptually different obligations. Again, as noted, "[c]ontract obligations are based on the manifested intention of the parties to a bargaining transaction, whereas tort obligations are imposed by law—apart from and independent of promises made and therefore *apart from the manifested intention of the parties*—to avoid injury to others." *Abraham II*, 350 Or at 36 (emphasis in original; internal quotation marks omitted). In *Farris II*, the plaintiffs' complaint did not allege, in either count, that the defendant owed them an obligation other than that specified in the contract between them. In particular, the plaintiffs' complaint did not allege that the defendant's actions were negligent.[11]

We conclude that *Farris II* does not bar our consideration of the viability of plaintiff's alleged common-law negligence claim. We therefore return to our consideration of the following factor in that analysis: whether ORS 746.230(1) imposes a legal obligation designed to protect insureds and their beneficiaries from the type of emotional harm that results from delayed payment of claims. In conducting that analysis, we find it helpful to consider, as we did in *Doyle*, 356 Or at 338-39, 363, whether a decision permitting plaintiff's claim "would be consistent with the statute, appropriate for promoting its policy, and needed to ensure its effectiveness."[12] In citing *Doyle,* we recognize that *Doyle* is

---

[11] In arguing for a different understanding of *Farris II*, the dissent observes that, in *Farris II*, the court described the plaintiffs' argument as an argument that the defendant was "guilty of a tort as well as a breach of contract" because it had "'exercised "bad faith" in its decision to deny coverage and to refuse a defense.'" 371 Or at 812 (Garrett, J., dissenting) (quoting *Farris II*, 284 Or at 455-56). We acknowledge that, in *Farris II*, the plaintiffs contended that the defendant's intentional, bad faith, breach of contract, could give rise to tort *damages*, but we do not understand the plaintiffs to have contended, or the court to have considered, the separate question, as explained in *Abraham II*, of whether the defendant had a tort *obligation* that was "*apart from the manifested intention of the parties*—to avoid injury to others." *Abraham II*, 350 Or at 36 (emphasis in original). As noted, in *Farris II*, the plaintiffs' complaint did not allege that the defendant acted negligently.

[12] As discussed in *Doyle*, 356 Or at 363, those factors are drawn from the *Restatement (Second) of Torts* section 874A comment h (1979) and are not exclusive.

not a negligence case. Rather, it is a case in which the plaintiff could not establish that the legislature intended to create a private right of action but, nevertheless, asked this court to create a new type of tort liability. Although that is not our undertaking here, plaintiff's invocation of ORS 746.230 requires a similar analysis. We will not permit recovery of emotional distress damages based in part on the existence of a statutory obligation if the claim for such damages is not consistent with the statute, appropriate for promoting its policy, and needed to ensure its effectiveness.

We therefore begin, as we did in *Doyle*, by examining the statute's provisions and the policies it is intended to promote. Defendant argues that, in enacting ORS 746.230, the legislature considered what remedies to provide for its violation and that its deliberate decision to limit those remedies to civil penalties payable to the state indicates that the statute was not enacted to impose liability on insurers for its violation. As we have explained, plaintiff accepts that the legislature did not intend to create such liability, but she nonetheless contends that imposition of liability in negligence is consistent with the legislative intent to prohibit certain unfair claims processing practices.

As a reminder, ORS 746.230 prohibits (1) "[r]efusing to pay claims without conducting a reasonable investigation based on all available information," ORS 746.230(1) (d); and (2) "[n]ot attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear," ORS 746.230(1)(f). We agree with plaintiff and the Court of Appeals that those prohibitions are evidently designed to protect insureds and their beneficiaries from the type of emotional harm that plaintiff in this case allegedly suffered. As the Court of Appeals reasoned, that intention is apparent from the context in which the statute was adopted—an insurance marketplace in which insurers advertise and sell their products as providing "peace of mind" to their policyholders:

"[W]e note that an elementary principle of insurance law is that insurance policies do not merely provide for the payment of funds in case of loss; they also provide the policyholder peace of mind. *See, e.g.*, 14 *Couch on Ins.* § 198:4

n 1 (3d ed 2021) ‹security and peace of mind are principal benefits of insurance[.]› *** The Oregon Supreme Court recognized that principle in *Farris* [*II*], noting that 'insurance contracts *** are made for economic and financial peace of mind.' *** A corollary to that principle is that statutes regulating the business of insurance—notice of cancellation requirements, for instance—are likewise intended to ensure peace of mind for policyholders. *See, e.g.*, 43 Am Jur 2d *Insurance* § 385 (2021) ('The primary purpose of such statutes is to ensure peace of mind for a policyholder.'). Thus, when the Oregon legislature enacted the Insurance Code 'for the protection of the insurance-buying public,' ORS 731.008, we take that to mean that the legislature enacted the code to ensure that the insurance-buying public gets what it pays for, including the peace of mind that is a principal benefit of an insurance policy.

"That certainly appears to be the point of a number of the provisions of ORS 746.230, which are directed at unfair claim settlement practices that implicate not only adverse economic consequences to the policyholder but also the stresses of dealing with insurance company bad faith and delaying tactics. *** Violations of those provisions certainly have economic consequences. But it cannot be denied that such violations commonly have significant emotional consequences for policyholders as well. The legislature may well have declined to provide a private right of action for damages when it enacted ORS 746.230. Especially given that the very nature of insurance is that it is purchased to ensure peace of mind, it is hard to imagine that the legislature did not intend the law, at least in part, to prevent policyholders from being forced to experience the stress of dealing with unfair insurance claim settlement practices."

*Moody*, 317 Or App at 246-48 (some citations omitted).

As the Court of Appeals also observed, the conduct that ORS 746.230 proscribes includes conduct that is independent of the obligation to pay benefits due under the insurance policy. For example, ORS 746.230 prohibits insurers from, "[f]ailing to acknowledge and act promptly upon communications relating to claims," ORS 746.230.230(1)(b); "[f]ailing to affirm *** coverage of claims within a reasonable time," ORS 746.230.230(1)(e); and "[c]ompelling claimants to initiate litigation to recover amounts due," ORS 746.230(1)(g). Those prohibitions suggest that the harm

that the legislature sought to prevent was not limited to the financial harm that occurs when insurance benefits are not paid.[13]

Next, as the court did in *Doyle*, we consider how specific the statute is—that is, whether it provides advance warning of the specific conduct that is prohibited. *Id.* at 353; *see also Philibert*, 360 Or at 715-16 (emphasizing the importance of providing "*ex ante* understanding of liability"). We find that the statute provides explicit notice to insurers of the conduct that is required and, in requiring insurers to conduct reasonable investigations and to settle claims when liability becomes reasonably clear, does so in terms that are consistent with the standard of care applicable in common law negligence cases.

Under *Doyle*, we also consider the adequacy of existing remedies and the extent to which a common-law negligence action "will aid, supplement, or interfere with existing claims and remedies and other means of enforcement." *Doyle*, 356 Or at 363-64. One existing common-law remedy is a breach of contract action, but, in such an action, emotional distress damages are not recoverable. Permitting a common-law negligence claim for emotional distress damages would supplement, but would not interfere with, the availability of a contract claim.

The same is true with respect to the remedies provided by the statute. As discussed, in ORS 731.988 the legislature provides for a civil penalty. However, we conclude that permitting a negligence claim for emotional distress damages would not interfere with the ability of the director of the Department of Consumer and Business Services to seek that remedy. The legislature has strengthened the ability of insurance regulators to protect insureds by permitting the director to bring actions for "actual damages" or

---

[13] The dissent states that the court in *Farris* explicitly rejected the proposition that the prohibitions set forth in ORS 746.230(1) are designed to protect policyholders' peace of mind. 371 Or at 823 (Garrett, J., dissenting). In *Farris II*, the court reasoned that that purpose was not a sufficient basis for concluding either that the legislature intended to provide a private right of action or that insurance contracts were not subject to the "universal rule" that emotional distress damages are not recoverable in a claim for breach of contract. Here, we consider that factor for a different purpose—to determine whether plaintiff's common-law negligence claim for emotional distress damages is consistent with the legislature's purpose in enacting the statute.

other equitable relief, on their behalf. ORS 731.256. There is no reason to believe that the director's apparently discretionary authority to do that would be negatively impacted by allowing insureds to bring their own negligence claims. *Doyle* instructs us to consider whether a tort action will "provide a greater deterrent and be more likely to [e]nsure compliance with the law." 356 Or at 354. We conclude that permitting a common-law negligence claim could have that effect, making it more likely that an insurer would be deterred from unreasonably engaging in prohibited conduct and thereby advancing the statute's purpose.

Nevertheless, we acknowledge, as defendant argues, that the legislature's decision not to create a statutory private right of action may reflect a concern that allowing plaintiff to recover emotional distress damages in this context would expose defendants to new and unfairly burdensome liability. It is important that our analysis account for such concerns, and we proceed to that undertaking.

> b.   Whether permitting recovery of emotional distress damages is consistent with recovery of emotional distress damages in other common-law actions and would not place an undue burden on defendants.

In this case, plaintiff alleges a claim against a party with whom she had a relationship, like that in *Tomlinson*, 362 Or at 446, that entailed a "mutual expectation of service and reliance." Plaintiff alleges that she and defendant were in a contractual relationship in which defendant undertook to provide her, as the named beneficiary of that contract, with certain insurance benefits. That is important because, in such a relationship, the service provider knows the identity of the person who contracts for or is the named beneficiary of those services and can be expected to act reasonably with respect to that person.[14] As a result, any concern

---

[14] When a party undertakes to provide services to another, that undertaking, and the contractual relationship that it reflects, may require that the service provider act with reasonable care. Thus, as this court explained in *Currey v. Butcher*, 37 Or 380, 384-86, 61 P 631 (1900), the contract serves as a "matter of inducement," and tort law imposes the "duty" to act with reasonable care. *Accord*, *Dowell v. Mossberg*, 226 Or 173, 181, 355 P2d 624 (1960) (in professional relationships, "the contract of employment is a matter of inducement," and the

that providing a claim for emotional distress damages could expose a defendant to unanticipated and indeterminate liability is ameliorated. *See Tomlinson*, 362 Or at 443-44 (people not generally required to affirmatively protect economic and emotional interests of others, and some limiting principle is therefore necessary to confer liability); *Philibert*, 360 Or at 704 (without some limiting principle, liability for emotional harms is potentially limitless).

That is particularly true when the defendant undertakes to provide services that, absent the exercise of reasonable care, may foreseeably create a risk of emotional harm. For instance, in *Curtis v. MRI Imaging Services II*, 327 Or 9, 14-16, 956 P2d 960 (1998), a patient alleged that his physicians had negligently failed to guard against the predictable psychological consequences of an MRI procedure, causing him severe emotional distress but not bodily injury. In upholding the patient's claim, this court observed that medical professionals may be required to protect against medical risks that "happen to be psychological in nature," when they violate a standard of care that contemplates adverse psychological reactions. *Id.* at 15. We said that,

> "where the standard of care in a particular medical profession recognizes the possibility of adverse psychological reactions or consequences as a medical concern and dictates that certain precautions be taken to avoid or minimize it, the law will not insulate persons in that profession from liability if they fail in those duties, thereby causing the contemplated harm."

*Id.* at 15-16.

Similarly, in *Rathgeber v. James Hemenway, Inc.*, 335 Or 404, 418, 69 P3d 710 (2003), the court again accepted

---

"failure to exercise due care" makes the action one in tort). As this court stated in *Georgetown Realty*, "[t]he rule stated in *Currey* *** has been followed *** in cases involving physicians, lawyers, real estate brokers, architects, engineers, and landlords." 313 Or at 103. *See, e.g.*, *Lindemeier v. Walker*, 272 Or 682, 538 P2d 1266 (1975) (contracting party has negligence claim against real estate broker for failure to obtain best price for real property); *Bales for Food v. Poole*, 246 Or 253, 424 P2d 892 (1967) (contracting party has negligence claim against architect for misplacing building on property); *Dowell*, 226 Or at 185 (contracting party has negligence claim against chiropractor for failure to diagnose disease); *Ashmun v. Nichols*, 92 Or 223, 234-35, 178 P 234, 180 P 510 (1919) (contracting party has negligence claim against landlord for failure to repair leased premises).

the premise that a defendant in a professional relationship with a client, there a real estate professional, could be liable for emotional damages, but it emphasized that, in such cases, the relevant standard of care must include protecting the client from such harms. *Id.* at 417-18. *See also Paul*, 351 Or at 599 (assuming without deciding that physicians have a duty, based on common law and health care information statutes, to protect patients against disclosure of health care information and emotional harm).

In *Tomlinson*, the parties were not in a direct physician-patient relationship, but one step removed, in a relationship of "mutual expectation of service and reliance." 362 Or at 450. Accordingly, we did not employ an analysis that considered whether the plaintiff had alleged a "standard of care that includes the duty to protect a client from emotional harm." *Curtis*, 327 Or at 14. Rather, we determined, as a matter of common law, that the parents had alleged facts that, if proved, could establish a legally protected interest in receiving information from the defendants that implicated the parents' reproductive choices and their interest in avoiding emotional harm. *Tomlinson*, 362 Or at 447.

We used a similar approach in *Hovis*, a case decided before *Tomlinson* and which was discussed in *Philibert*. In *Hovis*, the plaintiff had purchased a burial plot from the defendant city. The city had mistakenly buried the body of the plaintiff's husband in the wrong plot, and, without permission from or notification to the plaintiff, the city had disinterred the remains and moved them to the proper plot. At that time, Oregon statutes required private cemeteries to obtain consent before moving a deceased's body, but those statutes did not apply to municipal cemeteries. Therefore, the city argued, it had no obligation to obtain the plaintiff's consent and she had no common-law negligence claim for her emotional distress damages. 243 Or at 608-11. This court disagreed, recognizing the common-law right of a surviving spouse to have a cemetery act reasonably in dealing with her deceased husband's remains. *Id.* at 612-613. In *Philibert*, this court explained *Hovis* as a decision that recognized the common law as an extracontractual "legal

source" of liability for emotional distress damages. *Philibert,* 360 Or at 706.

Here, as in *Tomlinson* and *Hovis*, the parties are in a relationship of "mutual expectation of service and reliance." And, as in *Curtis*, the services that defendant undertook to provide are services that, absent the exercise of reasonable care, may foreseeably create a risk of emotional harm. The existence of that relationship reduces the risk that, in allowing plaintiff's claim, this court will be extending "indeterminate and potentially unlimited liability." In fact, contracts may, at times, provide a means for a defendant to control the extent of its liability. That is, a contract between a service provider and recipient potentially may alter or eliminate tort liability or remedies:

> "Because tort liability is imposed by common law negligence principles, that responsibility exists unless altered or eliminated by a contract or some other source of law."

*Abraham II*, 350 Or at 36-37. As the court further stated in *Abraham II*,

> "Parties may limit tort remedies by defining their obligations in such a way that the common law standard of care has been supplanted, *** or, in some circumstances, by contractually limiting or specifying available remedies."

*Id.* at 40 (citations omitted).[15]

The relationship between the parties is not, of course, determinative. In deciding whether a plaintiff has a legally protected interest sufficient to subject a defendant to liability for emotional distress damages, this court also has looked for other indicators that permitting such recovery will not impose an unfair burden on defendants. Thus, in *Philibert*, we looked to the nature of the injury and, in recognizing the plaintiffs' claim, called out the "objective indicators of possibly serious emotional injury." 360 Or at 715. Those indicators are present here as well. Life insurance is intended to provide peace of mind and necessary resources for a beneficiary, and a life insurer's unreasonable denial of promised benefits can certainly cause the beneficiary serious emotional injury. There are objective indicators of such

---

[15] The insurance contract at issue here included no such provision.

injury in that the death of a spouse is a significant loss, and that loss is compounded when the death is sudden and the person who loses the spouse is dependent on the spouse for their financial well-being. The spousal relationship and the need for insurance benefits can be objectively established, as can the unreasonable conduct of the insurer.

> c.    Whether plaintiff's interest is "of significant importance."

Furthermore, this court will not permit recovery of purely emotional injury unless we determine that the claimed harm is "of sufficient importance as a matter of public policy." *Philibert*, 360 Or at 705. In this case, plaintiff alleges that she is the surviving spouse of the decedent and was financially dependent on him. Plaintiff alleges that defendant failed to reasonably investigate and pay life insurance proceeds to which she was contractually entitled. Requiring reasonable investigation and prompt payment of such proceeds benefits not only those in plaintiff's shoes, but also society at large. When life insurance proceeds enable survivors to obtain basic needs such as food and shelter, the survivors are not dependent on society for those needs. Importantly, Oregon statutes governing the insurance industry indicate that the legislature has made a public policy choice to protect against the unfair processing and payment of insurance claims, which includes claims made by life insurance beneficiaries. When a surviving spouse incurs serious emotional distress as a result of the violation of those statutes, the harm and the statutory purpose are of sufficient importance to merit protection.[16]

---

[16] In reaching that conclusion, we are not alone. Many other states, by statute or judicial decision, permit claims for emotional distress damages against first-party insurers in some circumstances. *See, e.g.*, *Nassen v. National States Ins. Co.*, 494 NW2d 231 (Iowa 1992) (insurer liable in tort for emotional distress damages for bad faith denial of claim); *Curry v. Fireman's Fund Ins. Co.*, 784 SW2d 176 (Kentucky 1989) (permitting recovery in tort for consequential and punitive damages for bad faith breach of insurance contract); *White v. Unigard Mut. Ins. Co.*, 112 Idaho 94, 730 P2d 1014 (1986) (insurer liable in tort for bad faith denial of claim); *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz 188, 624 P2d 866 (1981) (permitting emotional distress damages in tort action arising out of insurer's willful refusal to pay a valid claim); *Gruenberg v. Aetna Ins. Co.*, 9 Cal 3d 566, 510 P2d 1032 (1973) (insurer liable in tort for emotional distress damages for violation of implied covenant of good faith and fair dealing).

3.   *On balance, we conclude that plaintiff has alleged a legally protected interest sufficient to subject defendant to liability for emotional distress damages.*

We began this opinion by stating the reasons that this court has been reluctant to permit recovery of emotional distress damages in the absence of physical injury or property damage and the need for a limiting principle, in addition to foreseeability, to avoid indeterminate and potentially unlimited liability. *Philibert*, 360 Or at 704. In this case, we are convinced that plaintiff has alleged a legally protected interest that provides that limiting principle; that is, plaintiff, as the surviving spouse of a deceased breadwinner, has a legally protected interest sufficient to support a common-law negligence claim for emotional distress damages against her husband's life insurer for failure to reasonably investigate and promptly pay her claim for insurance benefits. As in *Nearing*, Oregon statutory law imposes an obligation to protect that interest. In undertaking to provide insurance benefits, an insurer not only undertakes to provide necessary financial resources but also undertakes to provide the peace of mind that comes with knowing that those resources will be promptly paid, alleviating emotional distress and avoiding further psychological harm. As in *Tomlinson* and *Hovis*, the parties are in a relationship of "mutual expectation of service and reliance." As in *Curtis*, the services provided are intended to avoid inflicting emotional, as well as financial, harm. And, as in *Philibert*, there are objective indicators of possibly serious emotional injury. Considering all of those factors, and not relying on any one of them alone, we conclude that the insurance claim practices that ORS 746.230 requires and the emotional harm that foreseeably may occur if that statute is violated are sufficiently weighty to merit imposition of liability for common-law negligence and recovery of emotional distress damages.

Accordingly, we answer the question whether plaintiff has alleged a viable common-law negligence claim against defendant for emotional distress damages in the affirmative. We caution that our conclusion here does not make every contracting party liable for negligent conduct

that causes purely psychological damage, nor does it make every statutory violation the basis for a common-law negligence claim for emotional distress damages. Far from it. Few contracting parties promise to provide necessary financial resources on the death of a spouse knowing that their obligation to act reasonably in doing so is required by statute. And few statutes impose obligations on contracting parties designed to protect the parties from the type of emotional harm that plaintiff in this case allegedly suffered. Our decision in this case is a narrow one that applies and accords with the limiting principles that have guided our past decisions and does not unfairly expose defendant to liabilities that it could not have expected and guarded against.

## IV.   CONCLUSION

To summarize, we conclude that plaintiff has alleged a viable common-law negligence claim against defendant for emotional distress damages. Therefore, we also conclude that the trial court erred in granting defendant's motions to dismiss plaintiff's negligence claim and in striking her claim for emotional distress damages.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**GARRETT, J.**, dissenting.

Forty-five years ago, this court held that an insurer's bad-faith denial of an insurance claim constitutes only a breach of contract and, therefore, cannot support an action in tort to recover damages for emotional distress. *Farris v. U.S. Fid. and Guar. Co.*, 284 Or 453, 587 P2d 1015 (1978) (*Farris II*). That decision followed settled common-law principles: where parties have a contractual relationship, a breach of obligations resulting in damages will, ordinarily, support only a breach of contract claim, not a tort claim.

In this case, defendant insurer failed to pay out under the terms of a $3,000 life insurance policy after plaintiff's husband died. Plaintiff sued defendant for breach of the insurance contract. In addition, plaintiff's complaint purported to allege a tort claim for negligence—specifically,

"negligent performance of an insurance contract"—and sought damages of over $45,000 for emotional distress. The trial court dismissed that tort claim, as it should have under *Farris II*.

Today, the majority announces that an insurer's denial of coverage *can* support liability in tort—the proposition that *Farris II* rejected. As a result of today's decision, Oregon not only ceases to be among the jurisdictions that do not recognize tort claims for bad-faith denial of insurance benefits; Oregon joins the minority of jurisdictions that recognize the broadest version of such claims—premised only on an insurer's negligence. The majority avoids expressly overruling *Farris II* (which no one has asked us to do) by reasoning that that case did not address the issue raised here. I disagree. This court in *Farris II* was asked to recognize tort liability based on an insurer's bad-faith denial of coverage. It declined to do so, following an extensive discussion that is irreconcilable with the analysis that the majority adopts today. The considerations that the majority relies on to create tort liability for negligent denial of an insurance claim are the same considerations that the court in *Farris II* rejected when it held that the insurer's bad-faith denial "could only have been a breach of contract." 284 Or at 465. In effect, *Farris II* has been abrogated in the absence of any request that we do so and without undertaking the analysis that applies when this court is asked to overrule one of its precedents.

A.  *For plaintiff to win, this court must recognize a new basis for tort liability.*

The first obstacle that we encounter in assessing plaintiff's tort claim is that the claim is based, in part, on defendant's failure to perform *contractual* obligations. We have said that a tort claim cannot be predicated on a defendant's failure to perform contractual obligations unless the defendant's conduct in breaching the contract also breached an independent standard of care that exists separate from the contract terms. *See Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992) (party may bring a tort claim in addition to or in lieu of a contract claim "if the

other party is subject to a standard of care independent of the terms of the contract").

For example, in *Abraham v. T. Henry Construction, Inc.*, 350 Or 29, 33, 249 P3d 534 (2011) (*Abraham II*), the defendants contracted to build a home "in a workmanship like manner and in compliance with all building codes and other applicable laws." (Internal quotation marks omitted.) The plaintiffs alleged that the defendants had been negligent, causing water damage to the property. *Id.* The plaintiffs asserted both contract and tort claims. *Id.* The defendants argued that there could be no tort liability because the contract already covered the alleged conduct. *Id.* at 36. This court disagreed, noting that the defendants' alleged conduct breached the common-law tort obligation that imposes liability for negligently caused and foreseeable physical injuries. *Id.* at 37-38. Although the conduct underlying the contract and tort claims was the same, the tort obligation existed under the common law independent of the contract. *Id.* at 38.

In this case, plaintiff argues that the Insurance Code—specifically, ORS 746.230—provides a standard of care independent of the terms of the contract. As the majority correctly explains, however, not all statutes that govern private conduct can support private tort actions if violated. A court must conclude either that the legislature intended to create a so-called statutory tort or that the common law nevertheless recognizes a tort claim under the circumstances. Here, citing ORS 746.230 as an "independent standard of care" assumes what must be established as a threshold matter, which is that a tort cause of action exists for which that statute *supplies* the applicable standard of care. If the underlying conduct that ORS 746.230 addresses is not actionable in tort law, then the statute does not provide an independent standard of care capable of supporting such a tort claim.

To overcome that obstacle, plaintiff argues that a violation of the statutory standard of care imposed by ORS 746.230 should establish negligence *per se*. But, as the majority opinion recognizes, negligence *per se* applies only when there is an underlying negligence claim that imposes the usual reasonableness standard of care. As we have said, negligence *per se* may apply "[w]hen a negligence claim

otherwise exists, and a statute or rule defines the standard of care expected of a reasonably prudent person under the circumstances[.]" *Deckard v. Bunch*, 358 Or 754, 761 n 6, 370 P3d 478 (2016). Negligence *per se* replaces the reasonableness standard of care with a statutory standard of care—or, at least, a violation of the statutory standard of care creates a presumption of unreasonableness. *Id.* Such a claim thus assumes that, without the statute, tort law would still recognize a negligence claim based on the reasonableness standard of care. *See Gattman v. Favro*, 306 Or 11, 15 n 3, 757 P2d 402 (1988) ("Strictly speaking, the doctrine of 'negligence per se' does not create a cause of action. Rather, it refers to a standard of care that a law imposes within a cause of action for negligence."). If there is no reasonableness standard of care imposed by tort law under the circumstances alleged by a plaintiff, then there is nothing for the statutory standard of care to replace.

That brings us to the question whether the negligence claim that plaintiff advances here "otherwise exists," *i.e.*, whether Oregon tort law would recognize plaintiff's claim for negligence in these circumstances under the reasonableness standard of care. The answer, until today, was no. Plaintiff asserts a claim for a purely emotional injury allegedly resulting from defendant's negligence. As the majority notes, negligently caused emotional injuries are not generally actionable in tort law. 371 Or at 784. Unlike physical injuries, which are generally actionable whenever the defendant unreasonably created a risk of physical harm and the risk of the plaintiff's physical injury was foreseeable, negligently caused emotional injuries are actionable only in certain circumstances. *See Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or 543, 558, 652 P2d 318 (1982) ("Oregon has few precedents for liability for negligent injury to solely psychic interests."). This court decides, as a matter of law, those narrow circumstances in which negligently caused emotional injuries are actionable, as in *Philibert v. Kluser*, 360 Or 698, 385 P3d 1038 (2016) (recognizing common-law claim for negligently inflicted emotional distress suffered by family members who witnessed the victim being struck and killed by a vehicle).

Plaintiff's argument, properly understood, asks this court to recognize another new circumstance in which a negligently caused emotional injury is actionable in tort—specifically, that an insurer may be liable to an insured (or insured's beneficiary) for an emotional injury that results from the insurer's failure to exercise reasonable care in handling a claim for benefits.

Although plaintiff's theory requires recognizing a new basis for tort liability, that is not how plaintiff has framed her argument; in fact, she expressly disavows any need for this court to recognize something new. That failure to properly frame the argument likely stems from the confusing language that this court has used to discuss the existence and scope of obligations that, if breached, are actionable in tort. An obligation actionable in tort has traditionally been called a "duty." Courts properly use "duty" to identify what types of facts give rise to what types of tort obligations. This court has, at times, been hesitant to frame tort issues in terms of "duty" because of its uncertain status following *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987). But defining the existence and scope of obligations is a logically necessary component of tort law. When the court fails to use "duty" to describe the existence or scope of an obligation actionable in tort law, then the court must find other terms to do that work.

The court has not always been consistent in the terminology that it has used to replace the duty element. The majority opinion uses the concept of "legally protected interest" to describe its conclusion that, under the facts alleged, defendant may be liable for plaintiff's emotional distress damages. A more straightforward way to state that conclusion would be to say that defendant, because of its relationship to the insured, had an obligation (or duty) to avoid negligently creating a foreseeable risk of emotional injury to plaintiff. To say that a defendant is liable for negligently causing a type of injury is to say that the defendant had an obligation to avoid negligently causing a type of injury.[1]

---

[1] The majority opinion cites *Fazzolari* as prompting a move away from "duty." That is a common reading, but one that, in my view, overstates what *Fazzolari* did. The purpose of this court's extensive discussion in *Fazzolari* was to correct a misapplication of "duty"—an element that properly raises a question of law—to

B. *In* Farris II*, this court decided that an insurer's bad-faith denial of coverage is not actionable in tort.*

The majority concludes that the relationship between an insurance provider and an insured gives rise to an obligation, actionable in tort law, to avoid wrongfully denying an insured's claim. This court considered and rejected that idea in 1978, when it decided *Farris II*.

In *Farris II*, the plaintiffs purchased a liability insurance policy from the defendant. 284 Or at 455. After being sued, the plaintiffs tendered the case to the defendant, which denied coverage. *Id.* The plaintiffs defended the case themselves and subsequently sued the defendant, seeking damages for emotional distress. *Id.* The plaintiffs alleged two causes of action. The first claim alleged a breach of the insurance contract, asserted that the breach had not been in good faith, and sought damages for emotional distress.

---

describe fact questions about reasonableness or foreseeability. But that does not mean that there are no cases in which duty plays a role. In *Fazzolari* itself, the court first defined, and identified the facts giving rise to, the defendant's "duty" before concluding that the defendant's liability turned on fact questions for the jury. *See* 303 Or at 19 (describing the "duty of supervision" that a school owes to its students as "a special duty arising from the relationship between educators and children entrusted to their care apart from any general responsibility not unreasonably to expose people to a foreseeable risk of harm"); *id.* at 20 ("The scope of this obligation does not exclude precautions against risks of crime or torts merely because a third person inflicts the injury.").

While "duty" plays no independent role in cases involving physical injuries caused by a risk of harm that the defendant created, "duty" continues to play an affirmative role in other cases, such as cases involving purely economic injuries, purely emotional injuries, and affirmative duties of care. *See Fazzolari*, 303 Or at 7 ("[B]ecause common-law negligence traditionally has excluded some categories of quite predictable injuries and claimants (familiar illustrations include solely economic or psychic injuries, injuries due to a bystander's failure to rescue and injuries to trespassers), courts still find lack of a 'duty' a convenient label for these categorical rulings."); *see, e.g.*, *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992) ("[W]here the recovery of economic losses is sought on a theory of negligence, the concept of duty as a limiting principle takes on a greater importance than it does with regard to the recovery of damages for personal injury or property damage."); *Hale v. Groce*, 304 Or 281, 283-84, 744 P2d 1289 (1987) (opinion of the court by Linde, J.) ("[W]ithout a duty to plaintiff derived from defendant's contractual undertaking, plaintiff's tort claim would confront the rule that one ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property."); *Nearing v. Weaver*, 295 Or 702, 708, 670 P2d 137 (1983) (opinion of the court by Linde, J.) ("[T]here is no cause of action for negligent infliction of purely psychic or emotional injury as such, unsupported by a violation of some more specific duty toward the plaintiff.").

The second cause of action was not denominated as either a tort or a contract claim, and it alleged that the "[d]efendant's rejection of coverage and refusal to defend plaintiffs was not made in good faith and was made with the knowledge that such action would inflict mental distress and anguish upon plaintiffs." In addition to seeking damages for emotional distress, that second claim added a demand for punitive damages.

The plaintiffs demonstrated at trial that the defendant had denied their claim for benefits in bad faith: "At the time of final rejection of coverage, [the] defendant was aware that there was coverage but, nevertheless, chose to deny it." *See id.* The defendant's claim manager indicated an intent to "bluff it out[.] [W]e can always buy out at a later date." *Id.* (internal quotation marks omitted). A jury entered a verdict for the plaintiffs and awarded damages for emotional distress. *Id.*

In assessing whether emotional distress damages were available on those facts, this court recognized the importance of determining "whether [the] plaintiffs' action for damages is one of contract or one of tort." *Id.* at 456. We noted the general rule that a plaintiff may not recover for emotional distress caused by pecuniary loss resulting from breach of contract. *Id.* However, the plaintiffs had contended that the defendant was "guilty of a tort as well as a breach of contract." *Id.* at 455. The plaintiffs premised that claim on the fact that the defendant had "exercised 'bad faith' in its decision to deny coverage and to refuse a defense." *Id.* at 456. The court explained that, "if the facts justify an action of tort, courts are inclined to allow recovery for emotional distress as part of the damages flowing from a tort cause of action." *Id.* As a result, the court's analysis that followed addressed whether the facts established at trial justified an action in tort.

The court first considered whether a violation of the Insurance Code was actionable as a statutory tort, specifically the provision prohibiting insurers from "'[n]ot attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear.'" *Id.* (quoting ORS 746.230(1)(f)). We noted that an insurer may be subject

to civil penalties payable to the state for violations of the Insurance Code. *Id.* at 457. We concluded from the legislature's specific inclusion of a system of regulatory sanctions that the legislature did not implicitly intend for violations also to be a basis for civil tort claims:

> "There is nothing to indicate that the legislature intended, when it prohibited certain claims settlement practices in ORS 746.230, that actions for breach of insurance contracts would be transformed, in all of the covered instances, into tort actions with a resulting change in the measure of damages. The statutes express no public policy which would promote damages for emotional distress. Concern about the insured's peace of mind does not appear to be the gravamen of the statutory policy."

*Id.* at 458.

After concluding that the legislature did not intend for the defendant's violation of the statute to be a tort, we went on to consider the plaintiffs' separate argument that "the common law of the construction of insurance contracts dictates that defendant was guilty of the kind of 'bad faith' conduct *which gives rise to tort liability* and that damages for emotional distress are, therefore, recoverable along with [the] plaintiffs' other damages." *Id.* at 458-59 (emphasis added). The plaintiffs drew on cases recognizing that, upon accepting an insured's tendered claim for defense, a liability insurer must carry out that defense with due care. In those situations, "courts have held the insurer to a duty of 'good faith' in investigating the facts and in attempting to settle within the policy limits." *Id.* at 459. The plaintiffs in *Farris II* alleged a similar duty of good faith. As we described it, the plaintiffs sought emotional distress damages "arising *out of a tort action* for failure to exercise good faith in denying coverage." *Id.* (emphasis added).

At that time, this court had not clarified whether the failure-to-settle cases that the plaintiffs cited recognized an action in contract or in tort. We assumed, without deciding, that the failure-to-settle cases were based in tort but declined to extend them to the plaintiffs' claim, explaining, "it is our opinion that the rationale of such [a

failure-to-settle] action has no application to the present situation and that the present action is not one in tort." *Id.* at 460.

The court in *Farris II* identified the key distinction as being that the insurer takes on a fiduciary obligation in the failure-to-settle context but not in the denial-of-benefits context. We explained that, "[i]n an action for failure to settle within the policy limits, the insurance company is charged with acting in a fiduciary capacity as an attorney in fact representing the insured's interest in litigation." *Id.* That fiduciary relationship is never created when the insurer simply denies coverage. *See id.* ("In the present case, [the] defendant did not undertake this fiduciary duty to represent the insured's interest in the litigation—it refused it.").

The court in *Farris II* then quoted at length from a previous case making the same distinction between failure to settle and bad-faith denial, *Santilli v. State Farm*, 278 Or 53, 562 P2d 965 (1977). *Santilli* involved, like this case, an alleged bad-faith denial of life insurance benefits. *Id.* at 55-56. The plaintiff there sought to have this court "recognize a cause of action for tortious breach of an insurer's duty of 'good faith and fair dealing' when dealing with its insured." *Id.* at 61. The court in *Santilli* ultimately did not resolve the issue of whether to recognize a tort, but noted that,

> "[i]n cases involving the insurer's duty to pay under policies for theft, fire, health, disability or life insurance, the unique relationship which gives rise to the special duty of liability insurers to attempt to settle within their policy limits does not arise. The insured, or his beneficiary, is not subject to the imposition of excess liability, and his rights and responsibilities are limited to those set forth in his contract."

*Id.* at 62, quoted in *Farris II*, 284 Or at 463.[2]

_____

[2] The court did not resolve whether bad-faith denial of insurance benefits may establish a claim for tortious breach of an insurance contract because the court concluded that, even if the insurer had been wrong to deny the life insurance benefits, the parties' stipulated facts provided the insurer with "just cause for contesting liability," which would be sufficient to defeat a claim for tortious breach of an insurance contract. *Santilli*, 278 Or at 63.

The court in *Farris II* acknowledged that the plaintiff in *Santilli* had asserted a first-party claim for life insurance benefits, while the plaintiffs in *Farris II* sought relief from the insurer's failure to tender a defense on a third party's claim. *Farris II*, 284 Or at 463. But the court noted that, like *Santilli*, the plaintiffs' claim in *Farris II* "does not involve a failure to settle within the policy limits and the rationale expressed in *Santilli* is equally applicable." *Id.*

Similarly, the court in *Farris II* cited two cases involving the bad-faith denial of first-party claims for medical and fire insurance in which the Supreme Court of California had allowed recovery for emotional distress damages based on tortious breach of an insurance contract. *Id.* (citing *Silberg v. California Life Ins. Co.*, 11 Cal 3d 452, 521 P2d 1103 (1974); *Gruenberg v. Aetna Ins. Co.*, 9 Cal 3d 566, 510 P2d 1032 (1973)). The court in *Farris II* described those California cases as "sufficiently similar to this case that they are not able to be distinguished." *Id.* But, "for the reasons given in *Santilli*," the court in *Farris II* declined to follow those California cases in recognizing bad-faith denial of an insurance claim as actionable in tort. *Id.* at 464-65.[3]

The court then addressed the plaintiffs' policy arguments offered in support of their contention that the court should permit emotional distress damages. The plaintiffs had argued that "one who enters into a contract of insurance does so to guarantee himself peace of mind *** and, therefore, he should receive reimbursement for that for which he has bargained and not received." *Id.* at 465. In support of that argument, the plaintiffs cited two other California cases allowing emotional distress damages based on an insurer's tortious breach of contract. *Id.* (citing *Crisci v. Sec. Ins. Co. of New Haven, Conn.*, 66 Cal 2d 425, 426 P2d 173 (1967); *Fletcher v. W. Nat'l Life Ins. Co.*, 10 Cal App 3d 376, 89 Cal Rptr 78 (Cal Ct App 1970)). This court rejected that argument, stating that it "does not furnish a logical basis for recovery for emotional distress because many contracts for services, materials or financial assistance, as well

---

[3] The majority references one of those California cases, *Gruenberg*, as being in accord with the negligence claim that the majority is creating. 371 Or at 804 n 16). This court in *Farris II*, however, expressly rejected *Gruenberg*. *Farris II*, 284 Or at 464-65.

as insurance contracts, are similarly made for economic and financial peace of mind." *Id.*

Plaintiffs also appealed to the public interests involved in the insurance business, arguing that "public policy dictates that full responsibility for the results of failure to perform should be imposed" without respect to the traditional rule concerning contract damages. *Id.* at 466. This court responded that the plaintiffs

> "point[ed] out no reasons why such public interest should change the measure of damages which has resulted in the rule against recovery for mental distress brought about by an intentional breach of a contract. Any idea of punishment or warning to others is within the province of punitive damages and has no place in consideration of the propriety of a recovery for emotional distress."

*Id.*

As those passages show, this court in *Farris II* determined that the bad-faith claim denial by the insurer in that case was not actionable in tort. The court held that an insurer's decision whether to allow or deny a claim for insurance benefits does not trigger the kind of fiduciary relationship with the insured needed to implicate tort law. Rather than sounding in tort, the insurer's bad-faith denial "could only have been a breach of contract, and, in cases of breach, the law is clear that no recovery for mental distress because of threat of pecuniary loss is recoverable." *Id.* at 465.

This court has repeatedly characterized *Farris II* as declining to recognize a tort. *See Goddard v. Farmers Ins. Co.*, 344 Or 232, 263-64, 179 P3d 645 (2008) (characterizing *Farris II* as rejecting an insured's argument that "the insurer's denial of liability insurance coverage sounded in tort, so that the insured could recover for emotional distress caused by that denial"); *Georgetown Realty*, 313 Or at 108 n 5 ("This court [in *Farris II*] held that damages in tort were not recoverable because performance was never undertaken.").

The Court of Appeals has understood *Farris II* the same way. *See Shin v. Sunriver Preparatory School, Inc.*, 199 Or App 352, 366, 111 P3d 762, *rev den*, 339 Or 406 (2005) ("[W]here the insurer does not undertake the defense of the

insured, the carrier does not assume the fiduciary duty that would result from having done so, and its responsibilities are confined to the contract terms." (Citing *Farris II*, 284 Or at 460.)); *Warren v. Farmers Ins. Co. of Oregon*, 115 Or App 319, 324, 838 P2d 620 (1992), *rev den*, 316 Or 529 (1993) ("In [*Farris II*], the Supreme Court held that an insurer's failure to exercise good faith in denying coverage is a breach of contract, not a tort."); *Employers' Fire Ins. v. Love It Ice Cream*, 64 Or App 784, 790, 670 P2d 160 (1983) ("In [*Farris II*], the court held that an insurer's bad faith refusal to defend its insured under a liability policy gives rise only to a breach of contract claim, for which punitive and emotional distress damages cannot be recovered, rather than a tort claim."). Federal courts are in accord.[4]

C.   Farris II *disposes of this case.*

     *Farris II* answered the question whether an insurer's bad-faith denial of coverage can support liability in tort. The majority's contrary conclusion is based on a strained reading of that decision.

     At the outset, the majority distinguishes *Farris II* on the ground that that case arose in the third-party context. 371 Or at 792. That is true but irrelevant to the rule of

---

[4] Federal courts have read *Farris II* to preclude treating an insurer's bad-faith denial of insurance benefits as a tort claim. *See, e.g.*, *Vail v. Country Mut. Ins. Co.*, No 2:13-CV-02029-SU, 2015 WL 2207952, at *7 (D Or May 11, 2015) (holding that "recovery for emotional distress is typically not allowed" for bad-faith denial of insurance benefits (citing *Farris II*, 284 Or at 464)); *Russell v. Liberty Mut. Ins. Co.*, No 3:13-cv-00163-SU, 2013 WL 3994678, at *3 (D Or Aug 2, 2013) (holding that "a special relationship [giving rise to a tort claim] does not exist because defendant merely refused to defend plaintiff against the underlying CERCLA action" (citing *Farris II*, 284 Or at 462-65)); *Malbco Holdings, LLC v. AMCO Ins. Co.*, No CV-08-585-ST, 2008 WL 5205202, at *5 (D Or Dec 11, 2008) (relying on *Farris II* to hold "the type of breach of duty of good faith and fair dealing claim alleged here [bad-faith denial and failure to investigate] to be a contractual claim, not a tort claim").

Federal courts have also refused to apply the Court of Appeals' decision in this case, holding that recognizing a violation of the Insurance Code as negligence *per se* conflicts with this court's refusal in *Farris II* to recognize bad-faith denial of benefits as a tort. *See Koa v. Allstate Indem. Co.*, No 1:22-cv-00658-CL, 2023 WL 3066268, at *2 (D Or Mar 23, 2023) ("This Court recently declined to follow *Moody* in a nearly identical case, ruling that the Oregon Court of Appeals decision blatantly contradicts over 40 years of Oregon Supreme Court precedent."); *but see Butters v. Travelers Indem. Co.*, No 3:22-cv-726-SB, 2023 WL 3559472, at *2 (D Or May 18, 2023) (agreeing with magistrate judge's conclusion that "*Moody* and *Farris* do not clash").

law announced in *Farris II*, which applies with equal force
here. In *Farris II*, as discussed above, we held that the rela-
tionship between an insurer and insured imposes no obli-
gation on the insurer to act in the interest of the insured
unless an insurer accepts an insured's claim for liability cov-
erage. Thus, when an insurer denies a claim altogether, the
insurer is not subject to an obligation actionable in tort to
act in good faith. We rejected the plaintiffs' argument that
the nature of an insurance contract is one for which a breach
should give rise to such tort liability. *See Farris II*, 284 Or at
465 (concluding that protecting an insured's "peace of mind"
in the denial-of-coverage context "does not furnish a logical
basis for recovery for emotional distress because many con-
tracts for services, materials or financial assistance, as well
as insurance contracts, are similarly made for economic and
financial peace of mind").

Nothing about that reasoning is specific to a third-
party liability insurer refusing a tender of coverage in bad
faith. The court's analysis demonstrates that the reasoning
applies equally to the bad-faith denial of first-party claims.
In considering the plaintiff's argument in that case, we relied
on *Santilli*, a first-party coverage case like this one. *Farris II*
 284 Or at 463. And we rejected the reasoning of first-party
cases from California that we described as so similar that
"they are not able to be distinguished." *Id.* While some of the
facts in this case are different than in *Farris II*, the salient
facts are the same: as in *Farris II*, plaintiff seeks to impose
tort liability for a *denial of coverage*, as opposed to the breach
of obligations that might arise after coverage is accepted.

The majority appears to view *Farris II* as declin-
ing only to award tort "damages" for a breach of contract
"claim," without making a policy judgment about whether
the underlying facts should be actionable in tort. 371 Or at
794. That reading is problematic for several reasons. First,
although the majority opinion takes pains to suggest that
the plaintiffs in *Farris II* had only alleged contract claims, it
is far from clear that that is true. Second, it does not matter
whether that is true: Regardless of what the plaintiffs called
their claims in their pleading, this court understood that

the plaintiffs were asking the court *to recognize a tort*. We said so repeatedly.

As noted earlier, the plaintiffs in *Farris II* alleged two claims, but it is not clear how the claims were denominated. According to the abstract of record, the first claim was alleged in terms of breach of contract. The second claim was more ambiguous. It incorporated the earlier contract allegations by reference, but it emphasized the "bad faith" denial of coverage, requested damages for emotional distress, and, significantly, added a demand for punitive damages that the first claim omitted. Thus, although the second claim was not expressly denominated as a tort claim, the context suggests that the plaintiffs asserted a tort cause of action. That interpretation is consistent with what had happened earlier in that case. The plaintiffs had initially made a demand for emotional distress damages as part of their contract claim, but the trial court struck that demand, and this court affirmed that ruling. *Farris v. U.S. Fidelity & Guaranty*, 273 Or 628, 638, 542 P2d 1031 (1975) (*Farris I*). In that case, we held that, "when there is an unaggravated breach, such as alleged in the complaint, damages are not awarded for mental anguish. We do not decide what the result would be if there was evidence of an aggravated breach; that is, one, for example, made in bad faith or otherwise." *Id.* Because we had warned that a breach of contract claim might not support emotional distress even *with* an allegation of bad faith, it is logical to interpret the plaintiffs' amended pleading as asserting a *non*contract claim. That explanation is more plausible than the majority's suggestion that the plaintiffs tried to cure the deficiency in *Farris I* by stating two duplicative contract claims. 371 Or at 792 n 8, 795 n 10.[5]

---

[5] The majority also relies on *Abraham II* to assert that the plaintiffs in *Farris II* failed to allege the breach of a tort obligation that was distinct from the insurance contract. 371 Or at 796 n 11. It is unclear what the majority means. *Abraham II* was decided more than 30 years after *Farris II*, states that tort obligations and contract obligations may sometimes overlap, and explains that courts decide the existence of tort obligations under their common-law authority. *See Abraham II*, 350 Or at 36. *Farris II* is merely an example of the court exercising that authority in deciding not to recognize a tort obligation. In any event, it is unclear how plaintiff's negligence claim in this case is any more distinct from the insurance contract than the plaintiffs' claim in *Farris II*. Both claims assert that the insurer denied benefits owed under the insurance contract without a reasonable basis for doing so.

More important than how the plaintiffs' claims were denominated in their pleading is how they were argued and understood by this court. The idea that the court's analysis in *Farris II* was driven solely by the plaintiffs' pleading is undermined by the fact that the case had been tried to a jury, and the opinion never references the complaint or pleading standards. Instead, in *Farris II*, we noted that emotional distress would not normally be available for a breach of contract but observed that the plaintiffs were arguing that the insurer was "*guilty of a tort* as well as a breach of contract." 284 Or at 455 (emphasis added). The court further explained that, "*if the facts justify an action of tort*, courts are inclined to allow recovery for emotional distress as part of the damages flowing from a tort cause of action." *Id.* at 456 (emphasis added). The plaintiffs contended that their case was analogous to cases in which this court had recognized an insurer's liability for duty of good faith in defending and settling claims against an insured. *Id.* at 459. At that time, it was unsettled whether those claims sounded in contract or tort. *Id.* at 459-60. That explains why this court in *Farris II* found it necessary to address how those cases should be understood. We assumed that they sounded in tort, then explained that the denial-of-coverage context in *Farris II* was different than the failure-to-settle cases. *Id.* Further, the dissent in *Farris II* characterized the majority opinion as refusing to recognize a common-law tort claim because an insurer's bad-faith denial of a claim did not raise the same policy implications as an insurer's failure to settle, a policy judgment with which the dissent disagreed. *Id.* at 473, 476 (Lent, J., dissenting). Although the distinction between an insurer's failure to settle and an insurer's denial of coverage was the central point of the court's opinion in *Farris II*, that aspect of this court's reasoning is overlooked by the majority in this case.

In characterizing *Farris II* as holding that the plaintiffs' claim "was one for breach of contract," 371 Or at 794, the majority seems to view that as merely a descriptive statement about what the plaintiffs had alleged. On the contrary, this court was making a prescriptive statement: when we said that the plaintiffs' claim "*could only have been* a breach of contract," we were holding that the facts of that case *could*

*not* support a claim sounding in tort, which the plaintiffs needed in order to win emotional distress damages. *See Farris II*, 284 Or at 464-65 (emphasis added). The court was stating a legal conclusion about the facts that the plaintiffs had established at trial, not describing the legal theory that the plaintiffs had alleged in their complaint.

The majority also stresses that the plaintiffs in *Farris II* did not style their tort theory as a "negligence claim," but it is unclear what significance the majority thinks can be drawn from that. It is true that the court in *Farris II* did not explicitly address the standard of care that the plaintiffs were asking the court to impose. The court, however, noted that the defendant's denial of insurance benefits was intentional. *See id.* at 458 (referring to the defendant's conduct as an example of insurance providers "intentionally breaching their contract to settle their insureds' claims"). If the court was unwilling to recognize tort liability even for the intentional conduct proven in that case, it necessarily follows that the court implicitly rejected such liability for mere negligence.[6]

In the end, the majority acknowledges that *Farris II* makes repeated references to whether to recognize a tort. The majority explains away those references by proposing

---

[6] Further, the plaintiffs in *Farris II* relied on negligence case law. The plaintiffs argued for the creation of tort liability by drawing on case law recognizing an insured's claim for a liability insurer's bad-faith failure to settle. As noted above, this court had not resolved at that time whether such claims sounded in tort or contract. Nevertheless, both before and after *Farris II*, this court described the tort theory of recovery in those cases as a negligence claim.

In the leading case addressing the issue before *Farris II*—a case cited in *Farris II*—this court had repeatedly framed the tort theory of recovery as a "negligence" theory. *See Radcliffe v. Franklin Nat'l Ins. Co.*, 208 Or 1, 26-27, 298 P2d 1002 (1956) ("Some courts employ the negligence or due care theory in determining whether or not the insurer rendered itself liable to the insured when it dealt with a settlement matter."); *id.* at 29 ("The foregoing New Hampshire decisions are good representatives of those which employ the negligence theory."); *id.* at 31-32 ("It will be observed that in the decision just reviewed the court held that actions based upon a negligently conducted defense may employ both the contract and the negligence theory.").

And, when this court did finally resolve that issue, concluding that a liability insurer's bad-faith failure to settle sounds in tort, this court recognized that claim as a negligence claim. *See Georgetown Realty*, 313 Or at 111 ("[P]laintiff's excess claim can be brought as a claim for negligence."). Thus, the plaintiffs' reliance on that line of cases in *Farris II* does not appear to be grounds for distinguishing the majority's opinion in this case.

that *Farris II* was considering only whether to allow tort "damages" for a breach of contract "claim." 371 Or at 795 n 10. But the court described its task in *Farris II* more broadly than that, and its analysis admits of no such parsing. The court was deciding whether a set of facts should permit an award of damages for emotional distress as a matter of policy that turned on substantive considerations, not the fortuity of what labels the plaintiffs happened to attach to their legal theories. The court in *Farris II* could hardly have been clearer that it was grappling with those policy questions:

> "It may logically be asked what difference it makes whether the action is considered one of contract or of tort. In a case like the present where plaintiffs received no injury or fright resulting in serious physical manifestations, why should it be of moment, when considering whether to allow recovery for the emotional distress, whether a plaintiff's concern about his financial plight arose out of *a breach of contract or of a breach of contract which is also a tort*? In reality, there probably isn't any reason for a distinction. Either people should be able to recover for their fear of financial disaster as the result of the other party's intentional breach of a contract or they should not. Calling an intentional breach of contract a tort has no magical consequences which change anything. Neither is there anything inherent in a contract of insurance which makes the suffering any greater, any less, or any more certain than in numerous other business contracts which are generally breached intentionally and for which no recovery for emotional distress is allowed."

284 Or at 465 n 3 (emphasis added). *Farris II* rejects the availability of emotional distress damages for an insurer's bad-faith denial of coverage, full stop. It did not leave the door open for the next plaintiff to give the same claim a different name.[7]

---

[7] The majority's analysis creates uncertainty about the remaining precedential effect of *Farris II*. If the majority means to distinguish *Farris II* on its facts, then courts may still rely on *Farris II* as rejecting tort liability for third-party insurers that have denied coverage in bad faith, which were the facts presented in that case. On the other hand, if the majority is distinguishing *Farris II* based on the pleadings or based on the legal theory that the plaintiffs asserted in that case, then *Farris II* might have no precedential effect in any case styled as a negligence claim.

The majority's analysis is contrary to *Farris II* in other respects. The majority relies heavily on the relationship between the parties as support for recognition of a common-law negligence claim. The majority explains that the parties here are in a relationship of "mutual expectation of service and reliance," and that defendant "undertook to provide [] services that, absent the exercise of reasonable care, may foreseeably create a risk of emotional harm." 371 Or at 803. This court in *Farris II*, however, took full measure of the nature of the relationship in the simple denial-of-coverage context. Contrasting it to the fiduciary obligations that are triggered once an insurer accepts the defense of a liability claim, the court concluded that, when coverage is denied altogether, an insurer does not "undert[ake] any fiduciary duty by purporting to act in the interests of the insured." *Farris II*, 284 Or at 460. That lack of additional responsibility led the *Farris II* court to conclude that, when an insurer denies coverage in bad faith, the insured's action sounds only in contract. Without using the term "fiduciary relationship," the majority has in effect recognized a new special relationship between an insurer and insured, which *Farris II* refused to do outside the defense-of-liability context.

Separate from the special relationship issue, the *Farris II* court also considered and rejected the same policy arguments that the majority advances today as reasons to recognize a common-law negligence claim. The majority reasons, for example, that the prohibitions set forth in ORS 746.230(1) are "evidently designed" to protect policyholders' "peace of mind." 371 Or at 797. The court in *Farris II* expressly rejected that proposition: "The statutes express no public policy which would promote damages for emotional distress. Concern about the insured's peace of mind does not appear to be the gravamen of the statutory policy." 284 Or at 458.

The majority also opines that the claimed harm here—emotional distress resulting from an insurer's bad-faith denial of an insurance claim—is "of sufficient importance to merit protection," supporting recognition of a common-law negligence claim. 371 Or at 804. That is not a new idea, either, and *Farris II* rejected it, finding "no

reason[] why such public interest should change the measure of damages which has resulted in the rule against recovery for mental distress brought about by an intentional breach of a contract." 284 Or at 466.

In short, *Farris II* did what it appeared to do. It stated the rule that the bench and bar have understood it to state for nearly fifty years: there is no tort liability for emotional distress damages arising from an insurer's denial of coverage. In concluding otherwise today, the majority changes the landscape of insurance litigation in Oregon. Under *Farris II*, Oregon was among those jurisdictions that did not recognize tort claims for bad-faith denial of insurance benefits, even when the insurer's conduct was knowing and intentional. Today, Oregon joins the minority of jurisdictions recognizing the *broadest* form of those claims, requiring a plaintiff to establish only an insurer's negligence. *See* Stephen S. Ashley, *Bad Faith Actions Liability & Damages* § 5:2 (2d ed 1997) (identifying the negligence standard as the minority position among jurisdictions that recognize first-party bad faith insurance claims); Dobbs *et al*, 3 *The Law of Torts* § 702, 772 (2d ed 2011) ("A little authority requires only proof of negligence as ground for the insurer's tort liability. But the mainstream core test for judging tortious bad faith requires the plaintiff to prove that (1) the insurer lacked a reasonable basis for denying policy benefits to the insured and (2) that the insurer acted with knowing or reckless disregard of the inadequate ground for denying the benefits.").

In my view, *Farris II* disposes of this case. "[T]he principle of *stare decisis* dictates that this court should assume that its fully considered prior cases are correctly decided." *Farmers Ins. Co. v. Mowry*, 350 Or 686, 692, 261 P3d 1 (2011) (internal quotation marks omitted). If *Farris II* is to be abrogated, then plaintiff "must assume responsibility for affirmatively persuading [this court] that we should abandon that precedent." *Id.* (internal quotation marks omitted). In the absence of that showing, the trial court's judgment dismissing plaintiff's claim was correct and should be affirmed. I respectfully dissent.

Duncan, J., and Balmer, S.J., join in this dissenting opinion.